704 P.2d 437

**LaVerne ARMIJO, individually and next friend and personal representative of Raymundo Armijo, her deceased infant son, Plaintiff-Appellant,**

v.

**The REGENTS OF the UNIVERSITY OF NEW MEXICO, operating as the University of New Mexico Medical Center and Dr. Willis Kephart, Defendants-Appellees.**

**No. 7392.**

Court of Appeals of New Mexico.

Nov. 8, 1984.

184

Dennis F. Armijo, Armijo & Cameron, Farmington, for plaintiff-appellant.

Travis R. Collier, Debra Romero Thal, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for defendants-appellees.

## OPINION

ALARID, Judge.

LaVerne Armijo (plaintiff) appeals from a summary judgment granted to defendants, Regents of U.N.M. (Regents) and Dr. Willis Kephart. Plaintiff brought an action against defendants on her own behalf and on behalf of her deceased infant son, Raymundo Armijo (Raymundo). She alleged (1) medical malpractice against Dr. Kephart and Regents; (2) misrepresentation as to the quality of medical care received against Regents; and (3) fraudulent concealment of the facts surrounding the death of Raymundo, which, she claimed, gave rise to an action for punitive damages against Regents.

The trial court granted summary judgment to defendants on the basis of the running of the statute of limitations under the New Mexico Tort Claims Act (Act), NMSA 1978, Section 41–4–15 (Repl.Pamp. 1982).[1]

1. A personal injury and wrongful death claim based on medical malpractice of a government institution or government employee is controlled by Section 41–4–15. Claims based on medical malpractice not involving the government nor government employees are controlled by the Medical Malpractice Act, NMSA 1978, Section 41–5–13 (Repl.Pamp.1982)

On appeal, plaintiff raises two issues. First, she argues that fraudulent concealment of facts necessary to establish a cause of action tolls the statute of limitations during the period of that concealment. Second, she argues that the trial court erred in granting summary judgment because there were disputes as to material facts related to the issue of fraudulent concealment.

**FACTS**

Plaintiff, the mother of Raymundo, was provided prenatal care at a branch clinic of the University of New Mexico Medical Center (U.N.M.) during 1978. Doctor Kephart was not involved in the care until December 5, 1978, the day before the birth of Raymundo. On December 5, 1978, at approximately 5:30 p.m., plaintiff went to the U.N.M. hospital because she believed she was in labor. She testified that the staff in attendance instructed her to go home because she was not dilated enough for admission. The staff instructed her to time her contractions, and to return if her water bag broke.

Plaintiff returned to U.N.M. at approximately 11:30 p.m. that same evening because her contractions were frequent, with little or no time interval between them. Doctor Kephart examined her at that time, and instructed her to return home because she was not dilating. He also directed her to return to the hospital when her water bag broke. Plaintiff left the hospital, but "felt very strongly that it [Dr. Kephart's instruction] was a wrong decision." Plaintiff returned to her home, and remembered "feeling very, very angry and very frustrated."

Subsequently, at home, plaintiff took a warm bath to relax, as recommended in the childbirth classes she had attended. She began to bleed in the tub, and felt intense pain. The father of Raymundo, Arthur Lucero, who was living with plaintiff at the time, called Dr. Kephart and told him that he was bringing the plaintiff into the hospital.

Plaintiff was admitted at approximately 2:30 a.m. on December 6, 1978. Shortly afterwards, she gave birth to Raymundo. Doctor Kephart delivered the baby. At the time of the birth, plaintiff realized that the baby was not crying. She remembered the staff placing the baby in an incubator and taking him outside the delivery room. Plaintiff also remembered that she was "starting to get semi-hysterical" at this time, and was "not getting any answers" to her questions concerning Raymundo's health.

In the recovery room, plaintiff recalled Dr. Kephart later informing her that the umbilical cord apparently was pinched during birth, but that Raymundo was "in good hands now...." Plaintiff never saw Dr. Kephart after this conversation; U.N.M. pediatricians took over the care of the infant from that point forward in accordance with the clinic system at U.N.M. Plaintiff was discharged on December 7.

On December 8, the pediatrician treating Raymundo gathered the plaintiff and Mr. Lucero together at the hospital for a conference. According to the plaintiff, he told them that Raymundo "probably would never wake up, and that there was absolutely no brain activity whatsoever." When plaintiff asked what was the cause of these findings, the pediatrician stated that "it was because he [Raymundo] had been asphyxiated during birth, and that he [Raymundo] had had several seizures." Plaintiff did not ask how the asphyxiation occurred, owing to her "upset" condition. Shortly after leaving this conference, the plaintiff was called at her home by the pediatrician and notified that Raymundo had died. A hospital pathologist, who performed the autopsy, later met with plaintiff and related that the autopsy did not establish the cause of death, and that the baby appeared "normal."

Plaintiff did not make any further inquiry into the circumstances surrounding Raymundo's death during the following year. However, she gave birth again in November, 1979, at Presbyterian Hospital in Albuquerque. Prior to that birth, plaintiff consulted her new treating physician about the problems encountered with Ray-

mundo's birth. The physician reviewed the U.N.M. records of Raymundo's delivery, but could not determine from the records what had occurred. Plaintiff experienced no complications with this subsequent delivery, and felt that the procedures employed and care given at Presbyterian Hospital were "considerably different" from the procedures and care at U.N.M. Plaintiff stated, additionally, that she "started believing" that Dr. Kephart's actions might have caused Raymundo's death "shortly after" the delivery of her daughter.

Plaintiff had no further involvement with the matter of Raymundo's death until late 1980 or early 1981 when she requested the medical records relating to the labor, delivery, and death, and received from U.N.M. a summary of the autopsy report, a summary of lab tests, and a summary of the labor and delivery. She did not, at that time, receive the complete medical file.

In the summer of 1981 plaintiff saw an attorney regarding the circumstances of Raymundo's death. This consultation was sought because of plaintiff's feeling that she "hadn't gotten any answers" as to why Raymundo died, and because she "didn't really know how else to go about getting ... answers." Suit was filed on June 16, 1982.

## DISCUSSION

### I. Infant's Cause of Action

■ The parties agree that Section 41–4–15(A) of the Act controls this action. The statute reads in pertinent part:

A. Actions against a governmental entity or a public employee for torts shall be forever barred, unless such action is commenced within two years after the date of occurrence resulting in loss, injury or death, *except that a minor under the full age of seven years shall have until his ninth birthday in which to file* .... (Emphasis added.)

The statute, by its express terms, carves out an exception for minors' causes of action from the two-year limitation applying to other plaintiffs. *Tafoya v. Doe,* 100 N.M. 328, 670 P.2d 582 (Ct.App.1983). The statute, on its face, includes an occurrence

"resulting in ... death" as part of this exception. No language in the statute differentiates between a claim based upon a minor's death and a claim based upon a minor's injury. We conclude, under the plain meaning rule, that an action brought on behalf of a deceased minor, therefore, falls within the exception to the two-year limitation period. *See State v. Ortiz,* 78 N.M. 507, 433 P.2d 92 (Ct.App.1967).

■ We are confronted, at the outset, with two separate actions in the present case. Plaintiff sued (1) on behalf of Raymundo, for his pain and suffering and the deprivation of his life; and (2) on her own behalf, for her pain and suffering, and the loss of the companionship and society of Raymundo as a result of malpractice and misrepresentation. (The validity of plaintiff's individual claims are not involved in this appeal.) We read the limitation statute as applying the exception to a minor under seven years of age on the date of the "occurrence resulting in ... death." We conclude that the deceased infant falls under the exception, and that the cause of action on his behalf is not barred until after December 6, 1987, the date of his ninth birthday. The trial court's grant of summary judgment as to the claims brought on his behalf was error, and is reversed.

### II. Plaintiff's Cause of Action

■ The question becomes whether plaintiff's individual claims for her pain and suffering and the loss of companionship of Raymundo may be tacked on to the claims of the infant, thereby avoiding the operation of the two-year limitation period. A disability, such as minority, which saves one from the operation of a limitation statute is a *personal* privilege of the person under the disability only, and cannot confer rights on persons asserting independent actions. *Slade v. Slade,* 81 N.M. 462, 468 P.2d 627 (1970). The test under *Slade* for establishing an independent action is whether the action is brought on behalf of the minor, or on behalf of another pursuing claims personal to the other. Clearly, in the present action, plaintiff's claims for

pain and suffering and the loss of companionship and society are personal to *her*, not the infant. She cannot take advantage of the extended limitation section, and is subject to the two-year limitation period for all other plaintiffs.

Under Section 41–4–15(A), the limitation period begins to run from the time of loss, or injury. *Aragon & McCoy v. Albuquerque National Bank*, 99 N.M. 420, 659 P.2d 306 (1983). The parties do not contend otherwise. The statute runs on plaintiff's claim of pain and suffering from December 6, 1978, and on plaintiff's claim for loss of companionship from December 8, 1978, the date of Raymundo's death. Plaintiff, however, argues that the running of the limitation period was tolled by fraudulent concealment on the part of defendants.

In a medical malpractice action the statute of limitations may be tolled where a physician or hospital has knowledge of facts relating to malpractice, and fails to disclose such facts to the patient under circumstances where the patient may not reasonably be expected to learn of the improper acts. *Keithley v. St. Joseph's Hospital*, 102 N.M. 565, 698 P.2d 435 (Ct. App.1984); *See Garcia v. Presbyterian Hospital Center*, 92 N.M. 652, 593 P.2d 487 (Ct.App.1979); *Hardin v. Farris*, 87 N.M. 143, 530 P.2d 407 (Ct.App.1974). New Mexico follows the rule that where a confidential relationship exists; as between a physician and patient, or hospital and patient, *Garcia*, a duty arises to disclose all material facts relating to the patient's treatment. *Keithley; Garcia; Hardin*. A failure to do so may constitute fraudulent concealment. Normally, some positive act of concealment must be demonstrated such as a false representation by the physician or hospital. *Hardin*. However, where there exists a duty to speak as in a confidential relationship, "mere silence constitutes fraudulent concealment." *Id.*, 87 N.M. at 146, 530 P.2d 407.

Defendants argue that the doctrine of fraudulent concealment is not available to toll the statute of limitations under the Act.

Because the Act creates a cause of action in derogation of common law, defendants contend that the commencement of an action within the two-year limitation period is an indispensable condition of the Act. Defendants cite *Perry v. Staver*, 81 N.M. 766, 473 P.2d 380 (Ct.App.1970), which, in considering the Wrongful Death Act, NMSA 1978, Sections 41–2–1 to –4 (Repl.Pamp. 1982), held that the limitation provision thereof was not only a limitation on the remedy, but also on the right to bring an action for wrongful death. The *Perry* court concluded that estoppel cannot be asserted "to lengthen the existence of such a statutorily created right of recovery." 81 N.M. at 769, 473 P.2d at 383. Similarly, defendants maintain that fraudulent concealment, upon which estoppel may be based, is not available to toll the limitation period for tort claims under the Tort Claims Act and thereby lengthen the existence of the statutorily created right of recovery provided by the Act.

We disagree. The Wrongful Death Act does not control the disposition of this action. Section 41–4–17 of the Tort Claims Act provides that the Act shall be the *exclusive* remedy for plaintiffs with claims against governmental entities and public employees. Moreover, because of the specific inclusion of a wrongful death claim within the definition of a tort claim in Sections 41–4–5 to –12 of the Act, the limitations provision under the Wrongful Death Act does not apply to plaintiff's claims. *See Armijo v. Tandysh*, 98 N.M. 181, 646 P.2d 1245 (Ct.App.1981). We determine, therefore, the applicability of the doctrine of fraudulent concealment by ascertaining the intent of the legislature in enacting the Tort Claims Act, *see T.W.I.W., Inc. v. Rhudy*, 96 N.M. 354, 630 P.2d 753 (1981), not the Wrongful Death Act.

We hold that the doctrine of fraudulent concealment applies to toll Section 41–4–15. The declared policy and intent of the Act is to reject "the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity", Section 41–4–2(A), and to allow

suits against governmental entities in specific, listed categories, recognizing, however, that immunity should be maintained in situations "where the State may not have been able to act for some specific reason...." *Methola v. County of Eddy,* 95 N.M. 329, 333, 622 P.2d 234, 238 (1980). "Liability for acts or omissions under the ... Act shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." Section 41-4-2(B). The Act thus impliedly recognizes the duty of a hospital and physician to disclose material facts relating to a patient's treatment, and bases liability on a breach of that duty, or fraudulent concealment. Because fraudulent concealment does not create a separate cause of action, but acts to toll the statute of limitations in the malpractice cases, *Hardin,* it should similarly act to toll the statute under the Act.

Our application of fraudulent concealment to the statute is not only directed by the recognition of the traditional tort concepts of duty embodied in the Act. We are also directed by the purpose and goals of the legislature, as set out in Section 41-4-2(A). The Act mandates that suits against governmental entities and employees be allowed in certain instances to avoid the inequities inherent in the doctrine of sovereign immunity. Were we to preclude the application of fraudulent concealment to toll the statute, we would contravene the legislative intent. This would lead to an unreasonable and unjust result which we cannot allow. *State v. Santillanes,* 99 N.M. 89, 654 P.2d 542 (1982).

 We now turn to the propriety of the grant of summary judgment as to plaintiff's claims for pain and suffering and loss of companionship. A moving party must establish a prima facie case showing there is no genuine issue of material fact in order to be entitled to summary judgment. *Lackey v. Mesa Petroleum Co.,* 90 N.M. 65, 559 P.2d 1192 (Ct.App.1976). Once the showing has been made, the burden shifts to the other party to show the existence of a genuine issue of fact and the impropriety of summary judgment. *Knippel v. Northern Communications, Inc.,* 97 N.M. 401, 640 P.2d 507 (Ct.App.1982). The record establishes that: (1) Dr. Kephart informed plaintiff in the recovery room that the umbilical cord apparently was pinched during birth; (2) plaintiff was informed by a hospital pediatrician that Raymundo "would never wake up" because of asphyxiation during the birth; (3) the autopsy analysis and report could not determine the cause of the asphyxiation and death; (4) plaintiff was informed by a hospital pathologist that the autopsy did not establish the cause of the asphyxiation and death; (5) plaintiff was informed by her physician in 1979, after the physician reviewed the hospital records pertaining to Raymundo's birth, that the cause of death could not be determined; and (6) plaintiff received from the hospital in late 1980 or early 1981 a summary of the autopsy report, lab tests, and the labor and delivery. Plaintiff responds that the entire medical record was not made available to her in late 1980 or early 1981, and that it was not until Dr. Kephart's deposition was taken in August of 1982 that she discovered the cause of death, a fact kept from her by the hospital and Dr. Kephart. Plaintiff does not demonstrate, as did the plaintiff in *Hardin,* what specific facts were concealed by the hospital in not providing her with the entire medical file. Furthermore, the testimony of Dr. Kephart is consistent with the autopsy report provided to plaintiff in that it reiterates the uncertainty as to the cause of death. Plaintiff fails to raise a factual issue as to false representations on the part of defendants, or as to the silence of defendants concerning material facts relating to the delivery and death of Raymundo. The summary judgment as to these claims is affirmed. *Cf. Garcia* (summary judgment was improper where evidence existed of concealment of a hospital employee's negligence in the placement of a catheter).

 Plaintiff additionally brought a claim of misrepresentation against Regents as to the quality of medical care which

would be provided to her at the hospital, apparently made prior to the delivery of the obstetrical care. On appeal plaintiff does not specifically identify how this claim relates to the fraudulent concealment of malpractice issue. If, as we assume, plaintiff intends the misrepresentation claim to represent a separate claim from the fraudulent concealment of malpractice claim, plaintiff is still barred from presentation of this claim under Section 41–4–15(A). Any injury which plaintiff sustained as a result of any alleged misrepresentation as to the quality of medical care occurred no later than December 8, 1978, the date of Raymundo's death. Plaintiff had two years from this date within which to bring a claim based upon misrepresentation. Section 41–4–15(A). *See also Gaston v. Hartzell,* 89 N.M. 217, 549 P.2d 632 (Ct.App. 1976). If plaintiff is contending that the running of the limitation period on her misrepresentation claim was tolled by fraudulent concealment, the answer is that there is no factual issue as to fraudulent concealment, and that summary judgment was proper as to the misrepresentation claim.

Plaintiff did not argue on appeal a claim based upon breach of contract, which apparently was incorporated in an amended complaint. This claim is abandoned. *Novak v. Dow,* 82 N.M. 30, 474 P.2d 712 (Ct.App.1970).

Plaintiff's final claim was a claim for punitive damages based on fraudulent concealment. Because we have concluded there was no factual issue as to fraudulent concealment, this claim for punitive damages must necessarily fail.

Affirmed as to the claims of plaintiff; reversed as to the claims of plaintiff's deceased infant son, with instructions to reinstate these claims upon the trial court's docket. Each party to bear its own costs.

IT IS SO ORDERED.

DONNELLY, C.J., and WOOD, J., concur.